UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | NO. 3:21-CR-374 |
| v. | : | |
| **MICHAEL SLEVA,** | : | (JUDGE MANNION) |
| | : | |
| Defendant | : | |
| | : | |

**MEMORANDUM**

Defendant Michael Sleva, who is imprisoned at the Federal Correctional Institution at Otisville, New York, moves under 28 U.S.C. §2255 to vacate, set aside, or correct his sentence. (Doc. 84).

**I.   BACKGROUND**

Working with a confidential informant, Pennsylvania State Police officers conducted a controlled buy of methamphetamine at a residence in Port Carbon, Pennsylvania. Based on the information gathered through the controlled buy, they obtained a search warrant for the property, seized methamphetamine, and arrested Defendant, who was present.

On December 8, 2021, a grand jury in this district returned a two-count indictment charging Defendant with (1) Possession with Intent to Distribute

Methamphetamine and (2) Possession of a Firearm in Furtherance of a Drug Trafficking Crime. (Doc. 1). Defendant plead not guilty to the indictment. (Doc. 13). A superseding indictment returned August 10, 2022 added one count of Distribution of Methamphetamine. (Doc. 33). Defendant plead not guilty to the superseding indictment. (Doc. 49).

Following trial, Defendant was found guilty of Count 1, Possession with Intent to Distribute Methamphetamine, and not guilty on Counts 2 and 3. (Doc. 57). He was sentenced to a term of imprisonment of 120 months. (Doc. 72). Defendant filed a notice of appeal of the judgment of sentence, (Doc. 75), but then voluntarily dismissed his appeal. (Doc. 83). According to Defendant, he had to withdraw his appeal because the grounds he intended to raise were not argued by his trial counsel. (Doc. 85 at 4). He now seeks relief by the instant motion instead.

## II.   LEGAL STANDARD

### A. Motion to Vacate, Set Aside, or Correct the Sentence

Under 28 U.S.C. §2255, a prisoner in federal custody "may move the court which imposed the sentence to vacate, set aside, or correct the sentence" on "the ground that the sentence was imposed in violation of the laws of the Constitution or laws of the United States, or that the court was

without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." §2255(a).

### B. Ineffective Assistance of Counsel

The Sixth Amendment guarantees the accused in all criminal prosecutions "the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to the assistance of counsel is "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). A defendant may be deprived of this right where his counsel fails "to render adequate legal assistance." *Id.*

An ineffective assistance of counsel claim requires that a defendant show (1) "that his counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." *Williams v. Taylor*, 529 U.S. 362, 390 (2000) (quoting *Strickland*, 466 U.S. at 687). "To establish ineffectiveness, a defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 390–91. "To establish prejudice he must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 391.

### C. The Fourth Amendment and the Exclusionary Rule

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The bulwark of Fourth Amendment protection … is the Warrant Clause," *Franks v. Delaware*, 438 U.S. 154, 164 (1978), which provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Although there is "no provision expressly precluding the use of evidence obtained in violation of" these "commands," the "judicially created" "exclusionary rule" has been "designed to safeguard Fourth Amendment rights through its deterrent effect." *Herring v. United States*, 555 U.S. 135, 139–40 (2009). "[W]hen applicable," the exclusionary rule "forbids the use of improperly obtained evidence at trial." *Id.* at 139.

But "[t]he fact that a Fourth Amendment violation occurred … does not necessarily mean that the exclusionary rule applies." *Id.* at 140. The rule is "not an individual right and applies only where it results in appreciable

deterrence." *Id.* at 141. "In addition, the benefits of deterrence must outweigh the costs." *Id.*

### D. Challenges to the Validity of a Search Warrant

The requirement that a warrant be based "upon probable cause, supported by Oath or affirmation," U.S. Const. amend. IV., "takes the affiant's good-faith as its premise," presupposing that the factual showing comprising "probable cause" is "'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 154–65. For that reason, although there is a "a presumption of validity with respect to the affidavit supporting the search warrant," *id.* at 171, a criminal defendant may "challenge the veracity of a sworn statement used by police to procure a search warrant." *Id.* at 155. Such a challenge is measured against the following instructions.

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard of whose impeachment is permitted [] is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when

> material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing.

*Franks*, 438 U.S. at 171.

The standard for what constitutes "reckless disregard for the truth" has been set forth as follows.

> In evaluating a claim that an officer both asserted omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.

*United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (quoting *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000)).

### III.  DISCUSSION

#### A. Defendant's Argument

Defendant contends that the affidavit of probable cause—which supported the search warrant and resulted in the seizure of physical evidence used against him at trial—was contradicted by pre-trial evidence and trial testimony and lacked corroborating information. (Doc. 85 at 2–3). He asserts that he asked his trial counsel to challenge the search warrant,

but that counsel refused. (Id. at 3). It is presumably his contention that he was thereby deprived of the effective assistance of counsel. He says that had his attorney moved to suppress evidence, "this case may have likely not gone to trial." (Doc. 85 at 6). The government asserts that Defendant's motion lacks the evidentiary support required for a *Franks* hearing. (Doc. 88 at 7).

Defendant points to several statements in the affidavit of probable cause which he says were later shown to be false. Specifically, he cites the following statements.

(1) The affiant averred that the confidential informant had been providing information "in excess of 2 months." (Doc. 86 at 9; Doc. 89 at 3).

The court does not find that this statement was contradicted by trial testimony. Defendant contends that the affiant's testimony that confidential informant provided him information on August 24th refutes this statement. (Doc. 78 at 9:24–10:11). But the affiant also testified that he first encountered the confidential informant in "early summer—late spring or early summer of 2021." (Doc. 78 at 8:5–10). And when asked whether he "maintained … a working relationship with him" "[b]etween the

- 7 -

end of August 2021 and when you met him in early summer 2021," he testified: "I did, yes." (Doc. 78 at 9:17–20).

Defendant also points to the confidential informant's testimony that he had not spoken with the affiant "earlier in the summer" before his traffic stop in July.[1] (Doc. 78 at 139:7–11; Doc. 89 at 3). Earlier in his direct examination, however, the confidential informant testified that he first came in contact with the affiant "probably a month or two" before the controlled buy on August 25th. (Doc. 78 at 117:22–118:9.). The fact that he did not speak to the affiant before their initial traffic stop interaction does not mean that he did not provide information between then and August 24th.

(2)   The affiant averred that during the controlled buy, "[t]he CI was followed under constant surveillance from the meet location to the target residence. The CI arrived at the location at the south west corner of North St. and Center St. The CI was observed to go to the residence of 0 Center

---

[1]   Q: In July that led to the traffic stop, that led to your interaction with trooper Rothermel?
        A: Yes.
        Q: Had you spoken with him earlier in the summer?
        A: No.

(Doc. 78 at 139:7–11).

St. A short time later the CI left the residence and left the area under constant surveillance to a pre-determined meet location." (Doc. 86 at 12).

The affiant testified at trial concerning the controlled buy as follows:

Q: And if you could, I want you to explain in detail for the jury how this controlled buy is executed. So if you can start with the meeting with [the CI] on the 25th and please explain the steps you take to carry out the controlled buy.
A: Sure. I met with [the CI] on the 25th at a predetermined location. The C.I. … was searched thoroughly for any contraband or money, contraband meaning narcotics. After the search is conducted of him, he was not found to be in possession of anything illegal or money. He is given preordered buy money cash. At that point he was taken to the area of where the buy occurred. He was observed, kept under constant surveillance of going into the residence. He was kept under surveillance coming out of the residence. He proceeded back to my location making sure he didn't stop anywhere along the way. He then hands me the suspected narcotics, and then we left the area.

(Doc. 78 at 13:20–14:10).

He testified that the CI was not video recorded during the buy, was not wearing any type of body wire or camera, and that no photographs were taken of the operation. (Id. at 17:24–8). He further testified that the transaction itself, which occurred inside a residence, did not occur within his view, but that he maintained communication with the CI via cell phone text messages while the CI was inside the residence. (Id. at 19:25–20:15).

Defendant also cites the affiant's trial testimony that after he dropped the CI off at the buy location, he kept driving. (Doc. 78 at 54:6–8). The below testimony followed that statement.

> Q: So you were not a part of the surveillance team that could see Miller enter the church?
> A: That's correct.
> Q: Who else was on the surveillance team?
> A: It would have been corporal Anthony Garapoli, trooper Scott Growchowski, trooper Morgan Bright and I believe trooper Norbert Brennan.
> Q: Where were they stationed?
> A: I believe corporal Garapoli was on or across from S.R. 61 in this general area. As far as the other troopers, I can't speak to where they were.
> Q: So there was one—there was one trooper who would have been able to observe the door. You—
> A: I believe that was him, yes.

(Doc. 78 at 54:9–22).

The court finds that the affidavit statements are not contradicted by the trial testimony. The affidavit stated only that the CI was under constant surveillance before and after the buy inside the residence. It did not suggest that he was surveilled while inside the residence. The trial record pointed to by Defendant does not contradict the statement that the CI was under police supervision going into and coming out of the residence. Although the affiant testified that he kept driving after dropping the CI off

at the location, he further testified that other officers were present to observe the CI entering the residence.

(3) The affiant averred that before the controlled buy, "[t]he CI made contact with [Defendant] at 0 Centre St, Port Clinton Borough, Schuylkill County." (Doc. 86 at 11).

It was later clarified that by law enforcement that the "CI did not have any contact with [Defendant] the day before the buy took place." (Doc. 86 at 15).[2]

(4) The affiant averred that "[t]he information provided has been proven to be accurate and correct through independent investigative techniques,

---

[2] *See also* Doc. 78 at 73:8–74:10:

> Q: And here in this warrant your signature is on the affidavit that lists the following, C.I. made contact with [Defendant], the C.I. was searched for contraband with negative results and provided with prerecorded U.S. currency, correct?
> A: Correct
> Q: That was not true and correct, was it?
> A: That was—I listed, I guess, an error that I put he made contact with [Defendant] at the residence when in reality he was searched before he made contact with him at the residence.
> Q: Well, what happened was that there was no contact by [the C.I.] and [Defendant] prior to [the C.I.] being in the church is what we're hearing today, right?
> A: Yes, that's correct.
> Q: That's not what you told the judge when you signed the affidavit though, correct?
> A: When I said made contact with [Defendant], I meant he made contact with him in person.

including but not limited to surveillance, [and] investigative reports." (Doc. 86 at 9).³

Defendant asserts that "[d]uring trial this was revealed to be false also. No surveillance was done and no investigative reports were generated prior to the issuance of the search warrant." (Doc. 89 at 4).

Several statements during trial suggest a lack of independent investigative techniques. The affiant testified that the CI first told him about Defendant on August 24th, and that the police set up the controlled buy the next day. (Doc. 78 at 9:24–10:10, 11:25–12:3, 47:23–48:3). He then prepared and obtained the search warrant the same day that the controlled buy occurred. (Doc. 78 at 24:22–25:13). He also testified that he had not conducted surveillance of the property prior to the day of the controlled buy. (Doc. 78 at 48:19–22).

### B. Has Defendant shown that his counsel was deficient for failing to seek a *Franks* hearing?

As discussed, Defendant has pointed to statements in the affidavit of probable cause which seem to have been later contradicted. But if, with

---

³ It is not clear whether "the information provided" refers to the information pertaining to this case, or to other information provided by the CI, such as information about other drug traffickers and their operations (which was referenced in the discussion of the CI's qualifications). For present purposes, the court assumes it refers to information pertaining to this case.

these statements set to one side, sufficient information remains in the affidavit to support a finding of probable cause, then no *Franks* hearing would have been mandated. *Franks*, 438 U.S. at 171.

With statements (3) and (4) disregarded, the affidavit stated the following. The CI was qualified because he had been providing information, including information about drug traffickers and their operations, to law enforcement for over two months. (Doc. 86 at 9). He had been "a member of the drug culture" in local counties and had become familiar with narcotics dealers and their operations. (Id. at 9–10). He had also "made statements against his penal interest." (Id.).

The affidavit further detailed the controlled buy. It stated that officers met with the CI, searched him for contraband and US currency, found none, and provided him with pre-recorded currency. (Id. at 11). Officers followed the CI to the target residence and observed him enter and exit a short time later. (Id. at 12). The CI informed the affiant that a transaction had occurred inside the residence and provided him with an amount of methamphetamine consistent with the amount of funds used. (Id). Initial field testing confirmed that the substance was methamphetamine. (Id.).

As a result of this investigation, the affiant averred that evidence pertaining to violations of Title 35 of the Pennsylvania Crimes Code (18 Pa. Cons. Stat. et seq.) was located at the property. (Id. at 13).

"The role of a reviewing court is not to decide probable cause *de novo*, but to determine whether 'the magistrate had a substantial basis for concluding that probable cause existed.'" *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Probable cause is a 'fluid concept' that 'turns on the assessment of probabilities in particular factual contexts.'" *Id.* (quoting *Gates*, 462 U.S. at 232). "When presented with an application for a search warrant, the magistrate must 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit … there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Gates*, 462 U.S. at 238).

Based on the facts that the CI had provided other information to law enforcement and was knowledgeable about local drug traffickers and their operations, and that the controlled buy, before which officers searched the CI and during which the officers surveilled him entering and leaving the residence, produced methamphetamine, the magistrate had a substantial basis for concluding that there was a fair probability that contraband would

be found at the property. The affidavit thus contained sufficient information, even with the allegedly false statements set to one side, to support a finding of probable cause to search.

Because Defendant has not shown that he would have been entitled to a *Franks* hearing or suppression of evidence, he has not shown that his counsel's representation fell below an objective standard of reasonableness by failing to pursue those courses. Instead, his counsel reasonably opted to pursue other courses of establishing a reasonable doubt as to Defendant's guilt. The court therefore concludes that Defendant was not deprived of his Sixth Amendment right to the effective assistance of counsel, and that his sentence was not imposed in violation of the Constitution.

### IV.   CONCLUSION

For the foregoing reasons, Defendant's motion to vacate, set aside, or correct his sentence will be denied. An appropriate order will follow.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: January 5, 2024**
21-374-01